Norman **NEW RIDER,** a minor, by his mother and next friend, Wilma Williams et al., Plaintiffs-Appellants,

v.

**BOARD OF EDUCATION OF INDEPENDENT SCHOOL DISTRICT NO. 1, PAWNEE COUNTY, OKLAHOMA** et al., Defendants-Appellees.

No. 72–1608.

United States Court of Appeals, Tenth Circuit.

May 25, 1973.

Rehearing Denied June 20, 1973.

Lewis, Chief Judge, concurred in result and filed opinion.

Jeffrey I. Sandman, Asst. Atty. Gen., for Colorado Civil Rights Comm., James F. Reynolds, Director, Denver, Colorado, amicus curiae.

John S. Boyken, John Paul Kennedy, Salt Lake City, Utah, for Ute Indian Tribe of the Uintah and Ouray Reservations; Richard H. Bishop, Salt Lake City, Utah, of counsel, amicus curiae.

Yvonne T. Knight, Native American Rights Fund, Boulder, Colo. (Charles F. Wilkinson, Native American Rights Fund, Boulder, Colo., on the brief), and Vincent L. Knight, Oklahoma City, Okl., for plaintiffs-appellants.

Robert J. Scott, Pawnee, Okl. (William J. Perry, Pawnee, Okl., on the brief), for defendants-appellees.

J. Stanley Pottinger, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Carlton R. Stoiber, R. Dennis Ickes, Daniel L. Bell, II, for Civil Rights Division, U. S. Dept. of Justice, Washington, D. C., amicus curiae.

William C. Wantland, Seminole, Okl., for Oklahoma Indian Rights Ass., Norman, Oklahoma, amicus curiae.

Before LEWIS and BARRETT, Circuit Judges, and SMITH *, District Judge.

BARRETT, Circuit Judge.

Three minor Pawnee Indian students, by and through their next friends, appeal pursuant to 28 U.S.C.A. § 1291, from the Order of the trial court denying a permanent injunction and dismissing their complaints following a full evidentiary hearing. The appellants are members of the Pawnee Tribe. They were each enrolled as seventh grade students in the Pawnee Junior High School until they were indefinitely suspended on April 24, 1972.

The appellees are members of the Board of Education, the Principal and Superintendent of School District No. 1 of Pawnee County, Oklahoma. It is one school system, consisting of about 940 students, grades K through 12. There are three main ethnic groups among the students: some 61 percent white, some 33 percent Indian and some 6 percent black.

Jurisdiction is asserted under 28 U.S.C.A. § 1343(3) and (4) and 28 U.S.C.A. § 1331. The injunctive relief sought was predicated on allegations that the hair regulation at issue violated appellants' rights under the First and Fourteenth Amendments and 42 U.S.C.A. § 1983. The appellants contend that their guarantees of freedom of speech, free exercise of religion, equal protection of the law and due process of law were violated. We affirm the summary dismissal entered by the trial court on the ground that there exists no substantial constitutional question cognizable in the federal courts.

The subject hair regulation is part of a school dress code which provides in material part as follows:

Hair should have no odd coloring or style. It should be tapered or blocked in the back and cannot touch the shirt collar or ears, and should be one-fourth inch above the eyebrows; sideburns must be no lower than the earlobe and face clean shaven . . .

* Of the Eastern District of Michigan sitting by designation.

There is no dispute that the hair style of the three appellants violated the regulation.

On May 1, 1972, following a hearing, the trial court issued a preliminary injunction. In ordering the reinstatement of the three appellants, the Court found that the wearing of long braided hair is an expression of a long-standing tradition and heritage of the Pawnee Indians, and that it was a symbol of religious identity. Following a hearing held on June 5, 1972, issuance of a permanent injunction, the Court reversed its prior findings. It held that no substantial constitutional questions cognizable in the federal courts existed. It dismissed the complaint. The Court stated that the plaintiffs should seek their remedy in the state courts.

On Motion for Reconsideration filed by plaintiffs-appellants, the lower court conducted a full evidentiary hearing on August 7, 1972. In a detailed Memorandum Opinion dated August 10, 1972, the trial court again found that the schoolboard dress-hair code did not: (a) violate any of the plaintiffs' rights regarding any religious creed or belief, nor is the enforcement of the code a restriction of any religious belief, but 'at most a restriction upon a religious act'; or (b) discriminate against plaintiffs on the basis of race, religion or culture. The trial court also found that wearing of long hair is not akin to pure speech, and that a federal constitutional issue must exist not only in mere form, but in substance, and not in mere assertion, but in essence and effect. We affirm.

Turning now to the record, we summarize, as follows:

(1) For appellants: Certain exhibits in evidence, together with the expert testimony of one Dr. Weltfish, an anthropologist, established that certain Pawnee Indian men and women wore their hair parted in the middle with two braids, one on each side. Dr. Weltfish testified that such long braided hair has racial and cultural significance to the Pawnees, particularly in relation to specific dances; further, she testified that from the viewpoint of Pawnee theology the long braided hair has religious significance in that the Pawnees believed that the universe was created in terms of the cosmos and that the cosmos dictated the nature of the whole social, human, animal, vegetable and material order. She testified that the core of this theological belief is that everything the Pawnee does each day *has religious significance*. She stated that there were certain dances which required long braided hair. She acknowledged that in her book entitled "The Lost Universe" she *did not* refer to the Pawnee long braided hair in the sense of any religious significance. She did acknowledge that none of the Pawnee warriors wore long, braided hair, but rather roaches or a hair ridge standing up along the middle. On cross-examination she opined that other authors had not carefully noted Pawnee heritage and tradition in relation to hair styles and their significance.

The appellants, New Rider, Smith and Cummings, testified that they wished to wear their hair in long braids because of their pride in being Pawnee Indians. One Terry Williams, age 21, testified that the hair must be at least 6 or 7 inches long before one can start to braid it. On cross-examination, he testified that until eight or ten years ago the Indian dancers *did not* wear their hair long. On re-direct he stated that more of the young Indians are wearing long braided hair because of a renewed pride in their heritage. Sidney Moore, Sr., age 69, organized an Indian Dance Troupe which has travelled extensively. He learned the entertainment business from his participation with Buffalo Bill's Troupe. When he was a boy he wore long braided hair, but had to cut it off when he went to the Government boarding school. He referred to such hair style as the "old traditional ways." He sees a resurgence among the young Indian people to "regain their tradition, to learn their culture." He acknowledged that long braided hair is important to the dancing troupe insofar as making a living be-

cause "we have to wear our hair long in order to be recognized as Indians in a public place where we perform."

(2) For appellees: Leroy Holloway, Superintendent of Schools at Pawnee, stated that Rules and Regulations for students are necessary "to create an environment of learning" and that with only 47 teachers for 940 students, there must be "some kind of discipline code" including the dress code which incorporates the hair regulation. He opined that the dress-hair regulation here challenged provides school spirit, pride, and maturity for the student in the classrooms; he said that the regulation was initiated by the students in order to instill pride in their school and to create school spirit, without any intent to stifle speech. He testified that disagreement is encouraged. He stated that when the code was first adopted the Board allowed one exception at the specific request of Mrs. Cummings on behalf of her son which was thereafter revoked; and that the Board granted Mrs. Cummings a hearing following revocation, at which time she was accompanied by one John Trudell who remarked that the school and the town would be on its knees before "he left town." He also testified that the Cummings family was the only family which had requested the exception and that when the Board granted it to the Cummings boy it did so with the understanding that his hair would not be permitted to grow longer during the school term.

Jim Childers, Junior High School principal, testified for the appellees that the challenged dress-hair code was in effect during the entire school term 1971–1972. Copies of all school regulations were supplied each student who in turn was asked to discuss them fully with their teachers. On each Monday the teachers were to submit to Childers the names of students who violated school regulations. None of the three Pawnee students here involved violated the hair code until about six weeks prior to termination of the third semester. Childers then spoke personally to each of them and afforded each three

weeks to comply before he suspended them. He testified that he often enforced the hair code in relation to white students, without any problems. After the Court entered the temporary restraining order and the three plaintiffs were reinstated, Mrs. Cummings again informed Childers that her son was being abused. However, she did not give Childers any reasons.

Dr. Muriel Wright, Editor of the Chronicle of Oklahoma, Assistant Editor of the Oklahoma Historical Society since 1943, and Editor since 1965, and author of the book entitled "A Guide to the Indian Tribes of Oklahoma" relating to some 67 tribes, including the Pawnee Indians, testified for the appellees. She stated that there was no tradition or custom among the Pawnee Tribes relating to wearing their hair in long braided style, although she did acknowledge that some did in fact do so. She acknowledged that Pawnee culture and religion is highly integrated with most of the tribal practices and traditions.

Marvin Stokes, Superintendent of Schools at Byng, Oklahoma, who served 34 years either as principal or superintendent, testified for the appellees that the school system there consists of 17 percent Indian students, 15 percent Negro students, and the balance whites or Mexicans, some 1,500 students in all. He testified that Byng has a dress-hair code regulation in effect almost identical to the challenged regulation at issue here and that, in his opinion, there is a distinct relationship between its compliance and scholarship attainments of the students. He testified that schools in the area of Byng without such regulations do not attain the high scholarship attributable to the Byng school system. He also testified that the regulation instills pride and initiative among the students and that those students who are not well-groomed generally create trouble. Of particular interest, he testified that *it would be practically impossible to enact a dress-hair code for different ethnic groups within a school system which would not create a disruptive*

*atmosphere.* While recognizing that there are different ethnic and racial cultures, he stated that the integrated school system cannot countenance *different groups* and remain *one* organization.

■ Appellants contend that our decision in Freeman v. Flake, 448 F.2d 258 (10th Cir. 1971), cert. denied, 405 U.S. 1032, 92 S.Ct. 1292, 31 L.Ed.2d 489 (1972), does not control in the case at bar in light of fundamentally distinguishable facts bearing upon religious, cultural and racial issues. We did note in that decision—involving, as here, school hair codes—that no claim was made of any racial or religious discrimination. The complaining students in *Freeman* simply wished to express their individualities by wearing their hair so long that they violated the school hair codes. They contended that such expression was guaranteed them under the First Amendment free speech clause. In *Freeman* we held:

> The states have a compelling interest in the education of their children. The states, acting through their school authorities and their courts, should determine what, if any, hair regulation is necessary to the management of their schools. 448 F.2d at 261.

We explicitly held that the wearing of long hair is not akin to pure speech. We re-affirm that holding and thus put down any challenge to the subject regulation by the appellants here on a First Amendment free speech basis.

■ The instant action was filed on April 28, 1972, for injunctive relief. No state court remedy had been sought. We held in Freeman v. Flake, *supra*, that "the remedy provided by § 1983 is supplementary to any pertinent state remedy" and that "a federal constitutional question must exist 'not in mere form, but in substance, and not in mere assertion, but in essence and effect.'" 448 F.2d at 261. While the appellants did not first seek a pertinent state remedy prior to filing this action in the federal district court below as directed by Freeman v. Flake, *supra,* we shall not invoke the doctrine of abstention in light of the passage of time and the attendant need to resolve the issues in dispute.

■ Our careful review of the record has not disclosed to us any facts which would give rise to a federal court's duty to entertain the complaints or to afford any relief. Federal courts have the duty to entertain only *solid claims* of constitutional restraints under "color" of state law. Smith v. State of Kansas, 356 F.2d 654 (10th Cir. 1966), cert. denied, 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967). Courts must conduct the "balancing test" referred to in Barker v. Wingo, Warden, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in avoiding rigidity which would frustrate common sense, even when dealing with constitutional rights. Constitutional rights, including First Amendment rights, are not absolutes. Courts must balance them against a compelling public interest. Christian Echoes National Ministry, Inc. v. United States, 470 F.2d 849 (10th Cir. 1972), U. S. appeal pending. We cannot condemn the subject regulation unless it does in fact impinge on the exercise of fundamental constitutional rights or liberties. Dunn v. Blumstein, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

■ In this case there is neither a fundamental right at issue nor a suspect classification being applied. The hair code regulation bears a rational relationship to a state objective, i. e., that of instilling pride and initiative among the students lending to scholarship attainment and high school spirit and morale. It can hardly be contended from this record that the hair code regulation has " . . . no other purpose . . . than to chill the assertion of constitutional rights by penalizing those who choose to exercise them . . ." United States v. Jackson, 390 U.S. 570, 581, 88 S.Ct. 1209, 1216, 20 L.Ed.2d 138 (1968).

We believe that the same rationale applied by the Supreme Court in United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), which upheld the constitutionality of legislation punishing the destruction or mutilation of Selective Service Certificates applies here. There the Court rejected the contention that " . . . an apparently limitless variety of conduct [or appearance] can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea" and held that Government regulation of speech-related conduct is permissible:

> . . . if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression, and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest. 391 U.S. at 376, 377, 88 S.Ct. at 1679.

■ Although no precise formula has been developed, the Courts have held that the Fourteenth Amendment permits the states a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the states' objectives. McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

The very thrust of Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was that "education is perhaps the most important function of state and local governments" and that only by amalgamating children of various races, colors, cultural, ethnical and environmental backgrounds can the public schools become the effective "marketplace of ideas" for the benefit of all students. Common sense dictates that some uniform regulations are necessary in order to maintain order, spirit, scholarship, pride and discipline in the operation of such a school system.

■ In the recent case of San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), the Supreme Court held that though education is one of the most important services performed by the State, *it is not within the limited category of rights recognized by the Supreme Court as guaranteed by the Constitution.* Significantly the Court rejected the "nexus" contentions of the appellees: That it is the duty of the Court to order equal school district ad valorem tax assessments and to distribute the proceeds realized therefrom equally on a statewide basis in per-pupil expenditures on the ground that education is itself a fundamental personal right because it is essential to the effective exercise of First Amendment freedoms, and to intelligent utilization of the right to vote. The Court rejected these arguments, reasoning that "the logical limitations on appellees' *nexus theory are difficult to perceive.*" 411 U.S. at 37, 93 S.Ct. at 1299. (Emphasis ours). The Court declined to condemn the Texas legislative judgment in conferring on political subdivisions the power to tax local property to supply revenues for local purposes, noting that "this Court has often admonished against such interferences with the State's fiscal policies under the Equal Protection Clause," citing to Madden v. Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940), for the holding that members of a state legislature:

> . . . *enjoy a familiarity with local conditions which this Court cannot have; the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.* 309 U.S. at 88, 60 S.Ct. at 408 (Emphasis ours).

That there exists "some inequality" in a school system is not sufficient ground to strike down a whole system, McGowan v. Maryland, *supra,* and it is only where state action impinges on the exercise of fundamental constitutional rights or liberties that the court may interfere with

**700**

its dedication to local control of education. Dunn v. Blumstein, *supra;* Shelton v. Tucker, *supra.*

There is nothing inherently "suspect", in a constitutional sense, in the subject dress-hair code regulation. It was not promulgated on the basis of race as condemned in Brown v. Board of Education, *supra,* or upon national origin as condemned by Oyama v. California, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948), or upon alienage as condemned in Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), or upon indigency as condemned in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), or upon illegitimacy as condemned in Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972).

We believe that we would create a veritable quagmire for school boards, administrators, and teacher personnel, to attempt to wade through in their promulgation and enforcement of dress-hair codes which they may deem necessary to accomplish the objectives we have previously referred to, were we to hold that the subject dress-hair regulation implicates basic constitutional values. We need only ponder—without deciding—what exceptions beyond those urged here might be constitutionally mandated upon the appellees should the appellants prevail here. For example, from a strict Equal Protection approach, we might ask how a school board could draft a dress-hair regulation—or for that matter other such allied regulations—which would not impinge upon or interfere with a personal held belief that is sincere and meaningful in the life of its possessor (a student), parallel to that filled by the orthodox belief in God. We are, of course, referring to religiously held beliefs of conscientious objectors. See United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); Polsky v. Wetherill, 455 F.2d 960 (10th Cir. 1972); United States ex rel. Donham v. Resor, 436 F.2d 751 (2nd Cir. 1971); Bates v. Commander, First Coast Guard District, 413 F.2d 475 (1st Cir. 1969). No prescribed "belief" standard applies in such cases. The central core or theme is one of personal sincerity and belief. We shall not assume the responsibility of undermining the operations of the public school system by the various states through their duly chosen school authorities on such tenuous grounds. The judiciary is not designed to operate and manage school systems.

Affirmed.

LEWIS, Chief Judge (concurring in the result).

I concur in the result but do not consider the case to present the complexities that my Brother Barrett's opinion would seem to indicate and thus find it unnecessary, and undesirable, to give approval to some of the views and statements contained in the main opinion.

The plaintiffs here attack the subject hair code as violative of their right to free speech, due process, and as discriminatory to their race and religion. In Freeman v. Flake, 10 Cir., 448 F.2d 258, we held that no substantial federal question was present, per se, in a school hair code such as the one here considered. *Freeman* is controlling and need not be re-examined to support affirmance. Plaintiffs, however, make the additional contention, not considered in *Freeman,* that this particular code is discriminatively oriented as to race and religion. The record simply does not support these claims. More than two-thirds of the students affected by the code are white and the impact of the regulation is not unique to the Pawnee students. Nor is the code religiously oppressive to the Pawnee in a judicially recognizable manner. The Pawnee are near-pantheists, their every act having religious significance in their basic desire to live in harmony with the Universe. Hair styles, as the trial court correctly recognized, have traditional but variable significance to the Pawnee according to the trend of modern custom or a desire to renew or popularize the style of their forefathers. Their present contention of religious oppression rises no higher under

this record than a desire to express pride in their heritage through wearing long braided hair. Their desire so to do is understandable but not a constitutionally protected right.